United States District Court
Southern District of Texas

**ENTERED**

September 30, 2024

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | CIVIL ACTION NO |
| | § | 4:21-cv-04148 |
| | § | |
| | § | |
| IN RE: EP ENERGY E&P | § | JUDGE CHARLES ESKRIDGE |
| COMPANY LP, | § | |
| Debtor. | § | |
| | § | |
| | § | |

OPINION AND ORDER
AFFIRMING DECISION OF THE BANKRUPTCY COURT

EP Energy E&P Company, LP is the debtor in the underlying Chapter 11 bankruptcy proceeding.

Storey Minerals Ltd, Storey Surface Ltd, Maltsberger/Storey Ranch Lands LLC, the Estate of Sarah Lee Maltsberger, and Rene R. Barrientos Ltd are creditors and will be referred to together here as *the MSB Owners*. They appeal from an order of the United States Bankruptcy Court denying state-law and administrative-expense claims. Dkt 6.

The decision of the Bankruptcy Court is affirmed. See ROA 5651–97 (memorandum opinion), 5698 (order).

1.   Background

EP Energy filed for bankruptcy protection on October 3, 2019. The plan of reorganization was confirmed on August 27, 2020, and became effective on October 1, 2020. A bar date for the filing of all administrative-expense claims was set at October 31, 2020. ROA 0124–25.

This appeal concerns sixteen non-standard oil-and-gas leases in LaSalle County, Texas. The MSB Owners collectively leased the minerals to EP Energy's predecessor in 2009. Dkts 6 at 15–17 & 14 at 19–21. The parties agree

that the leases are "substantially the same" or "identical for the purposes of this appeal." Dkt 6 at 15; see also Dkt 14 at 20.

In May 2020, the market for oil collapsed due to a significant decrease in demand during the early months of the COVID-19 pandemic, along with market forces such as a dispute between Russia and Saudi Arabia. EP Energy sought to avoid producing oil that sold at a loss or not at all. It thus ceased production for the entire Eagle-Ford field, which included wells on land that it leased from the MSB Owners. Dkt 14 at 21. EP Energy then resumed production on the wells within forty or fewer days. Id at 22.

The MSB Owners filed what they refer to as a "threshold motion" with the Bankruptcy Court, seeking permission to bring state-law claims for trespass against EP Energy due to this cessation of production. They attached "an exemplary proposed petition" asserting trespass claims under state law and later submitted an amended proposed petition. Dkt 6 at 19; see also ROA 5465–84. They asserted that cessation had terminated the leases—meaning in turn, in their view, that title reverted to them, and EP Energy committed trespass by continuing to extract minerals from the leased land. ROA 5478–79 & 5481–82.

Because the confirmation order contained a bar date as to the filing of administrative-expense claims, the MSB Owners also filed a separate motion for allowance of administrative-expense claims pursuant to 11 USC §503. Dkt 6 at 19–20; see also ROA 0136–40. That motion included allegations that the lease terminated, EP Energy owed trespass damages for its continued oil-and-gas activities on the leases, and those damages constitute administrative expenses. ROA 0128–130.

The Bankruptcy Court considered the briefing and heard argument at numerous hearings. But it ultimately didn't rule on the threshold motion seeking permission to file the trespass claims in state court. It instead found that jurisdiction existed to allow or disallow the administrative-expense claims. It also found that it had constitutional

authority to assess the validity and value of claims against the estate because the MSB Owners sought a distribution from the bankruptcy estate. ROA 5651. The Bankruptcy Court then concluded that the trespass claims were futile because EP Energy never terminated the leases, and thus continued use of the property didn't constitute a trespass.

In short, the Bankruptcy Court didn't allow claims against the estate on the basis asserted by the MSB Owners. Id at 5652. They timely appealed. Dkt 1.

2. Legal standard

A district court functions as an appellate court when reviewing the decision of a bankruptcy court as to a core proceeding, thus applying the same standard of review as would a federal appellate court. See *In re Webb*, 954 F2d 1102, 1103–04 (5th Cir 1992). As such, findings of fact are reviewed for clear error, and conclusions of law are reviewed *de novo*. *In re Seven Seas Petroleum Inc*, 522 F3d 575, 583 (5th Cir 2008); see also Fed R Bankr P 8013. Matters within the discretion of a bankruptcy court are reviewed only for abuse of discretion. *In re Gandy*, 299 F3d 489, 494 (5th Cir 2002).

On review of a bankruptcy court's conclusions of law, the district court "may affirm if there are any grounds in the record to support the judgment, even if those grounds were not relied upon" by the bankruptcy court. *In re Green Hills Development Co*, 741 F3d 651, 656 & n 17 (5th Cir 2014) (citations omitted).

3. Analysis

The MSB Owners raise four issues on appeal:

- o *First,* whether the Bankruptcy Court erred by finding post-confirmation that it had jurisdiction and authority to deny the state-law claims;

- o *Second,* whether the Bankruptcy Court erred by denying abstention to permit the MSB Owners to proceed with the state-law claims in state court;

o *Third,* whether the Bankruptcy Court's final order denying the state-law claims deprived the MSB Owners of due process; and

o *Fourth,* whether the Bankruptcy Court erred by finding that the state-law claims were "futile" as a matter of law.

Dkt 6 at 14. These are essentially addressed in turn, although the third argument as to due process is considered where appropriate with respect to the other issues.

### a.  Jurisdiction

The MSB Owners contend that the Bankruptcy Court lacked jurisdiction because (i) the administrative-expense claim wasn't ripe; (ii) the state-law claims weren't before the Bankruptcy Court; (iii) the Bankruptcy Court lacked subject-matter jurisdiction over the state-law claims; (iv) even if there was jurisdiction, the Bankruptcy Court should have permissibly abstained; and (v) the Bankruptcy Court lacked authority to enter a final order. Dkt 6 at 29.

Each of these arguments fails.

### i.  Was the administrative-expense claim ripe for review?

Section 501(b)(1)(A) of Title 11 provides that administrative expenses include "the actual, necessary" post-petition "costs and expenses of preserving the estate." Claims for such expenses are "entitled to priority under the Bankruptcy Code's distribution scheme and [are] paid in full under a Chapter 11 plan unless the claimant agrees to other treatment." *Ellis v Westinghouse Electric Co, LLC*, 11 F4th 221, 227 (3d Cir 2021).

The MSB Owners assert that the administrative-expense claim—the basis of which is alleged trespass—wasn't ripe because their motion for allowance to pursue such a claim "merely preserved a potential Administrative Claim that never came to fruition." Dkt 6 at 30. They say that review of the administrative-expense claim would only be available if (i) a state court found EP Energy's conduct

4

to be in trespass of the MSB Owners' rights; (ii) damages were awarded that were allocable to the pre-effective date period; and (iii) the MSB Owners pursued those damages as a claim against the estate. And they argue that none of these things ever happened. Ibid.

EP Energy responds that the administrative-expense claim was ripe. It argues that all of the relevant conduct occurred post-petition and was complete, with the allowance motion having been timely submitted prior to the bar date. Dkt 14 at 30–32.

*Ripeness* is a justiciability doctrine drawn from "Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v Catholic Social Services, Inc*, 509 US 43, 57, n 18 (1993). Its "basic rationale" is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v Gardner*, 387 US 136, 148 (1967). An issue becomes ripe when it "would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v Holder*, 624 F3d 682, 684 (5th Cir 2010) (citation omitted). If the remaining questions are purely legal, the issues are fit for judicial decision. *Cochran v US Securities and Exchange Commission*, 20 F4th 194, 212 (5th Cir 2021).

Of note, the MSB Owners are the ones who filed a motion for allowance of administrative-expense claim pursuant to 11 USC §503. Dkt 6 at 20; see also ROA 0136–40. Administrative expenses like those requested by the MSB Owners include "the actual, necessary costs and expenses of preserving the estate." 11 USC §503(b)(1)(A). By definition, costs and expenses of preserving the estate have already occurred by the time of the effective date of the plan. See Dkt 14 at 32. And, as noted in the proceedings of *In re Worldcom, Inc*, "Logically, an entity who files a

request [for] payment of an administrative expense under §503(a) must be asserting a right to payment" for "obligations of the debtor *incurred during the pendency of its bankruptcy*." 401 BR 637, 642–43, n 9 (SDNY 2009) (emphasis added).

This alone suggests that the issue was ripe. And to a certainty, all relevant conduct as to the underlying trespass claims was complete by the time that the MSB Owners filed their motion. The parties also agreed before the Bankruptcy Court that the plain language of the leases resolved the temporary-cessation dispute (though they disagreed on interpretation of that language). ROA 5676.

Even so, the MSB Owners object now on appeal that the matter wasn't yet ripe because factual issues remained, such as whether the trespass was in good faith and the amount of damages. Dkts 15 at 7 & 27 at 9. They rely principally on two cases to support contention that the administrative-expense claim wasn't yet fit for decision. Dkt 6 at 31, citing *Reading Co v Brown,* 391 US 471 (1968), and *In re Charlesbank Laundry, Inc,* 755 F2d 200 (1st Cir 1985). Neither is on point.

As to *Reading Co v Brown*, the MSB Owners assert that it holds that a bankruptcy court has no jurisdiction to decide the merits of state-law claims "in lieu of the state court as part of [a] purported administrative-expense determination." Dkt 6 at 31. For this proposition, they point solely to a footnote, which states "the merits of negligence claims have not been adjudicated, and, of course, we intimate no views upon them." 391 US at 474 n 2. This infers too much. The footnote simply contains a statement clarifying the scope of that court's ruling, which was only as to whether the negligence claims qualified as administrative expenses in the first instance. It in no way determines that a bankruptcy court can't reach the merits of a tort claim in the context presented here.

As to *In re Charlesbank Laundry, Inc*, the MSB Owners cite it to support the following proposition: "Because liability and damages have not been determined in a proper state-court proceeding, the bankruptcy court cannot make a final determination regarding whether any contingent amount satisfied section 503." Dkt 6 at 30–31. But the case is factually distinct in that it concerned state-court actions that were already pending and about to be tried when the Chapter 11 petition was filed. The bankruptcy court elected in that context to vacate the automatic stay so that the state actions could proceed. 755 F2d at 201. That decision to permit the pending state-court actions to proceed doesn't establish that the bankruptcy court *cannot* reach the merits of an allowance claim, where no state-court action can be said to pre-exist the bankruptcy proceedings.

In sum, the relevant conduct occurred before the administrative bar date, and no precedent dictates that the merits of the trespass claims needed to have been resolved by a state court first. The administrative-expense claim was ripe and fit for decision.

### ii. Was the administrative-expense claim before the Bankruptcy Court?

The MSB Owners sought permission in their threshold motion to file the trespass claims in state court because the confirmation order and the plan prohibited filing in state court until the Bankruptcy Court determined that the dispute didn't constitute a "Claim." Dkt 6 at 33; see also ROA 5905–06. The Bankruptcy Court didn't expressly rule on the threshold motion but instead rendered it moot by ruling on the merits of the trespass claims. ROA 5651–98.

The MSB Owners assert that reaching the merits of the "proposed" state-court petition (which was attached as an exhibit to the threshold motion) was error. They contend that the trespass claims "were not before the bankruptcy court for disposal," but instead "existed independently of any Administrative Claim, and they were prevented from being filed." Dkt 6 at 32.

7

It was proper for the Bankruptcy Court to address the trespass claims as claims for administrative expenses. Administrative expenses typically benefit the estate, but the Supreme Court has made clear that "administration expenses can also be allowed for acts done in the administration of the estate that do not benefit the estate, but which harm non-debtors." *In re Theatre Row Phase II Associates*, 385 BR 511, 521 (Bankr SDNY 2008). Tort claims have been found to be "actual, necessary" costs ordinarily incident to operation of a business, and thus administrative expenses under 11 USC §501(b)(1)(A) for which claims can be brought. For example, in the context of alleged employment discrimination as presented in *Ellis v Westinghouse Electric Co, LLC*, the court explained that, while the alleged violation of law isn't a cost of doing business, a tort claim for employment discrimination is an administrative expense because the claim arises out of employment, and employment benefits the estate. 11 F4th 221, 230–31 (3d Cir 2021); see also *Reading*, 391 US at 483–85 (negligence).

So, too, here. While the alleged trespass isn't a cost of doing business, it remains an administrative-expense claim because it plainly arises out of the leases and uses of land, which clearly benefit the estate. EP Energy thus emphasized at hearing that the administrative-expense claim and the trespass claims are "one and the same." Dkt 27 at 45. Indeed, even the administrative-expense motion by the MSB Owners "incorporated by reference" the threshold motion, to which the state-court petition was attached. ROA 0125, 0140.

In sum, it wasn't improper for the Bankruptcy Court to decide that the trespass claims were futile. Indeed, it was the MSB Owners who sought a *distribution* from the bankruptcy estate in the first instance. This necessarily meant that the Bankruptcy Court had to determine if there was a *valid* claim against the estate (and if so, the amount). It wasn't a context where the Bankruptcy Court could somehow close its eyes to the underlying merits of the

trespass claim in deciding whether to allow it as an administrative-expense claim.

This argument by the MSB Owners also touches on their due-process concern. They contend that the Bankruptcy Court's decision to rule on the administrative-expense claim before the threshold motion "deprived MSB of its right to have its claims fully heard and litigated, contrary to due process protections under the Constitution and the rules of procedure." Dkt 6 at 34–35. But they cite no authority indicating that ruling on the merits of the administrative-expense claim in such way was a violation of due process. To the contrary, the Bankruptcy Court properly considered the merits of the trespass claims through a bankruptcy vehicle—that is, the process afforded as to claims allowance. It made its determination in that respect only after briefing and argument. Nothing suggests that other or further process was due.

No violation of due process occurred in this respect.

### iii.   Did the Bankruptcy Court have subject-matter jurisdiction?

Title 28 to the United States Code provides that district courts "shall have original and exclusive jurisdiction of all cases under title 11" and "shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 USC §1334(a)–(b); see also *In re US Brass Corp*, 301 F3d 296, 303 (5th Cir 2002). District courts may then refer to bankruptcy judges all cases "and any or all proceedings arising under title 11 or arising in or related to a case under title 11." 28 USC §157(a).

Once a matter is referred, the extent to which a bankruptcy court may adjudicate it depends on whether the proceeding is considered to be *core* or *non-core*. *In re Wilborn*, 609 F3d 748, 752 (5th Cir 2010). The Fifth Circuit has described the difference between *core* and *non-core* matters as follows:

> "Core" proceedings are those that "arise under" Title 11 insofar as they involve a

cause of action created by a statutory provision therein, and those that "arise in" cases under Title 11, which by their nature can only arise in bankruptcy cases; the district court may refer such core matters to the bankruptcy court for full adjudication. ... For matters that "relate to" bankruptcy cases, however, the bankruptcy court may only issue proposed findings and conclusions to the district court.

Ibid, citing *Matter of Wood*, 825 F2d 90, 97 (5th Cir 1987); *In re Southmark Corp*, 163 F3d 925, 930, n 8 (5th Cir.1999); 28 USC §157(b).

The MSB Owners argue that the Bankruptcy Court had neither core (*arising under* or *arising in*) jurisdiction nor non-core (*related to*) jurisdiction over the trespass claims. Dkt 6 at 35–40. To the contrary, this administrative-expense claim is properly characterized as a core proceeding. The Bankruptcy Court thus didn't err in its conclusion that it had jurisdiction. ROA 5659.

Title 28 explicitly provides that core proceedings "include . . . allowance or disallowance of claims against the estate." 28 USC §157(b)(2)(B); see also *BVS Construction, Inc v Prosperity Bank*, 18 F4th 169, 173 (5th Cir 2021). And the Fifth Circuit observes that "a reorganized debtor often must resolve, post-confirmation . . . administrative claims . . . which fall within 'core' bankruptcy jurisdiction." *Matter of Chesapeake Energy Corp*, 7 F4th 273, 281 (5th Cir 2023).

Despite the explicit statutory language characterizing administrative-expense claims as core, the MSB Owners contend that this action is not a core proceeding because the trespass claims are state-law-based and independent of the bankruptcy. Dkt 6 at 36–37. But the Fifth Circuit is clear that a bankruptcy court can reach underlying merits of state-law claims when determining the allowance or disallowance of claims against the estate. For example, in *In re Moore,* a creditor filed a proof of claim for debts owed

by the debtor. At issue were underlying state-law theories of fraudulent conveyance, constructive trust, and reverse veil piercing. The Fifth Circuit explained that "the state-law basis of the claims is not dispositive" because "the Bankruptcy Code governed the avoidance action" and "resolving the state-law claims is necessary to adjudicating its proof of claim." 739 F3d 724, 728 (5th Cir 2014). Because the state-law claims "would necessarily be resolved in the claims allowance process," the Fifth Circuit found "the bankruptcy court had authority to enter final judgment" on the merits. Id at 726, 728, quoting *Stern v Marshall*, 564 US 462, 499 (2011).

So, too, here. The merits of the trespass claims "would necessarily be resolved in the claims allowance process." Ibid. By filing an administrative-expense claim, the MSB Owners sought part of the bankruptcy estate, and in order to determine whether the MSB Owners were entitled to any such part, the Bankruptcy Court had to resolve the substantive question of trespass. And for their part, the MSB Owners are unable to point to any authority contrary to that cited above which would prohibit a bankruptcy court from denying an administrative-expense claim against the bankruptcy estate on the basis that the claim is futile under state law. See also *In re Southmark Corp*, 163 F3d 925 (5th Cir 1999) (recognizing "that many truly bankruptcy issues, like the determination of the basis for creditors' claims, turn on state law," and fact that "claims . . . arose under state law does not prevent them from involving core jurisdiction").

The Bankruptcy Court reached the merits of the trespass claims pursuant to the claims-allowance process, which is a core proceeding under the Bankruptcy Code. Subject-matter jurisdiction thus existed. Arguments by the MSB Owners as to *related to* jurisdiction thus needn't be addressed because it is determined that the Bankruptcy Court properly exercised *arising under* jurisdiction. See Dkt 6 at 37–41; see also Dkt 24 (advisory regarding *Matter of Chesapeake Energy Corp*, 70 F4th 273 (5th Cir 2023), arguing that *Chesapeake* mandates application of post-

confirmation *related to* standard and bars jurisdiction here).

> iv. Should the Bankruptcy Court have abstained?

Bankruptcy courts are by statute directed to abstain in certain circumstances even where subject-matter jurisdiction exists. The MSB Owners argue that the Bankruptcy Court erred in not so abstaining from reaching the merits of the state-law trespass claims. Dkt 6 at 41.

Section 1334(c)(2) of Title 28 addresses mandatory abstention. The Fifth Circuit has interpreted §133(c)(2) to mandate that federal courts abstain from hearing a state-law claim when:

> (1) The claim has no independent basis for federal jurisdiction, other than bankruptcy jurisdiction;
>
> (2) The claim is a non-core proceeding;
>
> (3) An action has been commenced in state court; and
>
> (4) The action could be adjudicated timely in state court.

*In re Moore*, 739 at 728–29. This requires an affirmative finding as to all four factors. And quite plainly, no action had been commenced in state court. See Dkts 6 at 42 & 14 at 36–37. Likewise, it's determined elsewhere above that this matter is a *core* proceeding. The Bankruptcy Court thus didn't abuse its discretion in declining to find mandatory abstention to apply.

Section 1334(c)(1) pertains to permissive abstention. Whether to abstain in such context requires consideration of fourteen non-exclusive factors:

> (1) Effect or lack thereof on the efficient administration of the estate if the court recommends [remand or] abstention;
>
> (2) Extent to which state-law issues predominate over bankruptcy issues;

(3) Difficult or unsettled nature of applicable law;

(4) Presence of related proceeding commenced in state court or other non-bankruptcy proceeding;

(5) Jurisdictional basis, if any, other than bankruptcy jurisdiction;

(6) Degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7) The substance rather than the form of an asserted core proceeding;

(8) The feasibility of severing state-law claims from core bankruptcy matters to allow judgment to be entered in state court with enforcement left to the bankruptcy court;

(9) The burden of the bankruptcy court's docket;

(10) The likelihood that the commence-ment of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11) The existence of a right to a jury trial;

(12) The presence in the proceeding of non-debtor parties;

(13) Comity; and

(14) Possibility of prejudice to other parties in the action.

*Special Value Continuation Partners, LP v Jones*, 2011 WL 5593058, *7–8 (Bankr SD Tex). The Fifth Circuit observes that bankruptcy courts "have broad discretion to abstain from hearing state law claims whenever appropriate 'in the interest of justice, or in the interest of comity with State courts or respect for State law." *Matter of Gober*, 100 F3d 1195, 1206 (5th Cir 1996).

The MSB Owners assert that all but the fourth factor weigh in favor of abstention. Dkt 6 at 44. Not so.

Quite critically, as to the *first*, the disposition of the administrative-expense claim naturally affects the bankruptcy estate. And as to the *sixth*, the claims-allowance process is a core proceeding, and the merits of the claim will necessarily be decided in that process, which finding implicates several other factors. For example, as to the *seventh*, the proceeding is core both in substance and form. As to the *eighth*, it isn't feasible to separate the state-law merits from the core claims-allowance proceeding. And as to the *second*, while it's true that the merits issue involves Texas law, the Bankruptcy Court was correct to note that it is at base a legal question that must be resolved in assessing the validity of the claim.

And further, as to the *tenth*, nothing in the record suggests forum shopping. Indeed, it was the MSB Owners themselves who initiated a claim in the Bankruptcy Court. ROA 5674. Relatedly, as to the *thirteenth*, comity with state courts isn't at issue because the trespass claims are solely before the Bankruptcy Court. As to the *ninth*, while the Southern District of Texas is one of the busier bankruptcy courts, nothing in the record indicates that handling this matter would be (or was) overly burdensome. And as to the *fourteenth* factor, other than the MSB Owners themselves, there are no other parties in this action who could possibly be prejudiced by the Bankruptcy Court deciding this matter.

The MSB Owners are certainly correct that several of the factors could support abstention. But the first, second, fourth, sixth, seventh, eighth, ninth, tenth, thirteenth, and fourteenth factors all weigh against abstention—several heavily so. The Bankruptcy Court thus didn't abuse its discretion in declining to permissively abstain.

### v. Did the Bankruptcy Court have authority to issue a final order?

The MSB Owners also contend, "Because the State-Law Claims are non-core, the bankruptcy court should have issued a report and recommendation to the district court after concluding that the State-Law Claims were denied. Having failed to do so, the bankruptcy court

deprived MSB of yet another important procedural due process protection." Dkt 6 at 47.

It is already determined above that the administrative-expense claim is explicitly a core proceeding. The Bankruptcy Court thus had jurisdiction to enter a final order. 28 USC §157(b)(1). No violation of due process occurred in this regard.

### b.   Merits of the trespass claims

The MSB Owners alternatively argue that the Bankruptcy Court erred in determining that their state-law trespass claims were futile. They contend that, under the plain language of the leases, the cessation of production in 2020 terminated the leases, which in turn meant that they were owed trespass damages for EP Energy's continued operations on the leases. Dkt 6 at 47–71.

The threshold issue is whether the leases terminated. That depends on interpretation of several clauses in the subject leases.

The leases here contained the following *habendum* clause:

> Subject to the other provisions and limitations hereof, this lease shall be for a term of four (4) years from the effective date (hereinafter called the *"primary term"*), and as long thereafter as oil or gas is produced from the leased premises or this in force and effect under the other terms and provisions hereof.

ROA 5928 (emphasis original).

A *habendum clause* in an oil-and-gas lease generally "defines the duration of the mineral-lease estate" and "divides a lease's duration into two parts: a primary term and a secondary term," where "the primary term usually lasts for a fixed period of time stated in the lease, while the secondary term continues the lease after the primary term expires for" as long as oil, gas, or another mineral is produced or the lease is otherwise maintained. *Endeavor*

*Energy Resources, LP v Discovery Operating, Inc*, 554 SW3d 586, 597 (Tex 2018).

It's undisputed that the primary term under the leases expired in 2013, with the secondary term beginning thereafter. The parties dispute whether, notwithstanding the cessation in production in 2020, EP Energy "maintained the lease in force and effect under the terms and provisions" of the leases under this clause.

The Bankruptcy Court determined that EP Energy maintained the leases under two provisions, being that (i) under the *continuous-development provision*, EP Energy maintained seven leases by continuing to drill new wells, and (ii) under the *temporary-cessation clause*, EP Energy maintained nine other leases by restoring production within 120 days. ROA 5652. On appeal, the MSB Owners contend that neither of these maintained the leases, meaning that the Bankruptcy Court erred as a matter of law.

i.   Continuous-development provision

Generally, a *continuous-development provision* allows oil-and-gas leases "to be preserved under certain circumstances even though there is no production after the expiration of the primary term during *continuous* drilling operations, whether on the same or different wells." *Endeavor Energy*, 554 SW3d at 597, quoting 8 Howard R. Williams & Charles J. Meyers, Oil and Gas Law: Manual of Oil and Gas Terms 951 (LexisNexis Matthew Bender 2017) (emphasis original). Such a provision "extends the entire lease so long as the operator remains engaged in the required development efforts." Id at 598.

The continuous-development provision here follows that general approach:

> If this lease has not otherwise terminated as herein elsewhere provided, then within [120] days after the latter of either the expiration of the primary term (if oil or gas are being produced in paying quantities from the leased premises at the expiration

16

of the primary term) or the completion of
any well drilled or reworked by lessee on
the leased premises within [180] days prior
to the expiration of the primary term,
lessee shall have the right to commence the
drilling of an additional well on the leased
premises . . . . Likewise, if this lease has not
otherwise terminated as herein elsewhere
provided, then within [120] days after
completion of such additional well as a
producer of oil or gas or the abandonment
of the same as a dry hole, lessee shall have
the right to commence the drilling of yet
another well on the leased premises . . .
[T]he commencement and drilling of
successive wells may be continued by lessee
until lessee has completed a sufficient
number of wells to continue this lease in
force as to all leased premises as provided
in Paragraph IX below, or until lessee
elects to cease drilling additional wells
thereon.

ROA 5952–53.

The Bankruptcy Court held that this provision allowed
continuous-development operations to hold the entirety of
each lease in force so long as EP Energy complied with its
drilling obligations. ROA 5676.

The MSB Owners don't actually dispute that EP
Energy complied with its drilling obligations under the
continuous-development provision. See Dkts 6 at 66 & 14
at 63. Instead, they argue that EP Energy's compliance in
this regard couldn't maintain the leases because,
immediately after expiration of the primary term, a
*separate-lease clause* cut short any leases where production
ceased. Dkt 6 at 53–56. The Bankruptcy Court didn't err in
rejecting this argument.

Generally, a separate-lease clause (also referred to as
a *retained-acreage provision*) "divides the leased acreage
such that production or development will preserve the

lease only as to a specified portion of the leased acreage." *Endeavor Energy*, 554 SW3d at 597–98, 606. Such clauses generally take effect after *both* the primary term *and* "continuous drilling or other savings provisions reach their end." *Mayo Foundation for Medical Education v Courson Oil & Gas, Inc*, 505 SW3d 68, 70 (Tex App—Amarillo 2016, pet denied).

The separate-lease clause here follows that general approach and provides:

> After the occurrence of any event described in subparagraph (a) of this Paragraph XI, production from or operations conducted on each production unit shall maintain this lease in force as to, but only as to, that portion of the leased premises included within such production unit, and production from or operations on one unit will not maintain this lease as to any other production unit.

ROA 5956–57. Subparagraph (a), also referred to as a *termination clause*, in turn provides that:

> If this lease has not otherwise terminated as herein elsewhere provided, then upon the expiration of the primary term or upon the cessation of continuous drilling operations conducted in accordance with Paragraph VIII [*viz*, the continuous-development provision] hereof, whichever occurs later, this lease shall then terminate as to all lands covered hereby except land within a production unit or units at that time. In addition, this lease shall then terminate with respect to [the deep rights] below . . . each such production unit at the time of such termination.

ROA 5955–56.

Thus, quite obviously, the leases generally terminate of their own accord at the *later of* the expiration of the

primary term *or* the cessation of continuous drilling operations.

The MSB Owners agree with this natural reading of the termination clause on its own. But they argue that reference to the termination clause in the separate-lease clause is more limited. They contend that because the separate-lease clause is triggered by "any event described in subparagraph (a)" (meaning the termination clause itself), the separate-lease clause is triggered immediately upon the expiration of *either* the primary term *or* cessation of compliance with the continuous-development clause, regardless which occurs later. Dkt 6 at 53–54. In their view, the phrase "whichever occurs later" in the termination clause is then immaterial in triggering the separate-lease clause. And since the primary term indisputably ended in 2013, the MSB Owners argue that the separate-lease clause was immediately triggered, meaning that the continuous-development clause could no longer serve to continue each lease in force as to all leased premises—only as to the leases where production occurred would be maintained. When production stopped, all those leases terminated.

This is incorrect. The Fifth Circuit admonishes that courts should "consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Kern v Sitel Corp*, 517 F3d 306, 309 (5th Cir 2008), quoting *Coker v Coker*, 560 SW2d 391, 393 (Tex 1983) (emphasis original). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." Ibid; see also Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* §§24, 27 (West 2012) (instructing that "text must be construed as a whole" and "provisions of a text should be interpreted in a way that renders them compatible, not contradictory").

The interpretation sought by the MSB Owners would ignore this instruction, with consequent effect of reading the modifier "whichever occurs later" out of the lease. The Bankruptcy Court instead properly harmonized all parts of the lease in its understanding that "any event" means "any *termination* event" under subparagraph (a). See ROA 5676–79. No other interpretation gives effect to the "whichever occurs later" language in the termination clause. To the contrary, as just noted, the interpretation offered by the MSB Owners would instead render that phrase meaningless. And the MSB Owners provide no persuasive reason in accord with all principles of proper interpretation suggesting that the "whichever occurs later" requirement in the termination clause should not be included in the reference to that clause in the separate-lease clause.

As noted by the Bankruptcy Court, the interpretation sought by the MSB Owners would also have the consequent effect of reading the continuous-development clause itself out of the lease. See ROA 5677. Under their reading, the separate-lease clause would come into effect at the end of the primary term, thus terminating leases without production, regardless of whether continuous development is occurring. This would render meaningless the unambiguous right of EP Energy under the continuous-development provision to maintain the "leased premises"— that is, the entire lease—"after expiration of the primary term." See ROA 5678. The Bankruptcy Court instead properly harmonized all parts of the lease in its understanding that the separate-lease clause only takes effect upon *the later of* the primary term ending or the cessation of continuous-drilling operations.

Applying that interpretation of the leases to the facts here, the primary term had obviously ended. So, termination under subparagraph (a) would occur only upon the *later* event, being the cessation of continuous-drilling operations. That hadn't occurred as to seven of the leases, meaning that no event under subparagraph (a) had occurred. As such, the separate-lease clause wasn't

20

triggered, and the continuous-development clause allowed EP Energy to maintain the entirety of those seven leases.

This interpretation is consistent with other Texas courts that have construed similar continuous-development and separate-lease clauses. Courts have held that such separate-lease clauses "typically do not take effect until after the continuous drilling or other savings provisions reach their end." *Mayo Foundation*, 505 SW3d at 70, 72–73 (holding that production units need not be designated immediately upon end of primary term and can instead be designated after end of continuous operations); see also *Community Bank of Raymore v Chesapeake Exploration*, LLC, 416 SW3d 750, 756 (Tex App—El Paso 2013) (rejecting argument that upon expiration of primary term, lease's "severance" clause segregated production units and limited "effect of the continuous-development clause to the confines of each producing unit so that the clause operated only within each unit, rather than on a lease-wide basis"). True, these cases interpreted leases with differently worded temporary-cessation and separate-lease clauses. Even so, both cases support the proposition that, in a typical oil-and-gas lease, the separate-lease clause doesn't cut short the continuous-development clause. And if the parties had wished to deviate from this typical formula, they would have done so with clarity of intent reflected in their language.

The Bankruptcy Court thus didn't err in choosing the interpretation consistent with the typical practice of oil-and-gas leases. See *Wenske v Ealy*, 521 SW3d 791, 797 (Tex 2017) (noting that "principles of oil-and-gas law inform our interpretation" of such contracts); *Endeavor Energy*, 615 SW3d at 148 (courts should "construe contracts from a utilitarian standpoint bearing in mind the particular business activity").

In sum, the effect of the continuous-development provision is that, if EP Energy drilled a well within 120 days of the expiration of the primary term, then by drilling another well within 120 days of the first well's completion or abandonment, EP Energy could continue to maintain its

right to drill on an entire lease, and so on. EP Energy elected to exercise its continuous-development rights at the end of the primary term. Dkt 14 at 52. EP Energy complied with the drilling schedule, and continuous development has been ongoing since 2013. The end of the primary term, then, can't be the later occurring event under subparagraph (a) (the termination clause). Instead, only cessation of continuous drilling operations can have triggered the separate-lease clause. That cessation hadn't occurred. And so, the separate-lease clause wasn't in effect, and continuous development maintained the seven leases in the continuous-development phase *in their entirety*.

The Bankruptcy Court didn't err in determining that the MSB Owners' claim was futile as to these leases.

ii.    Temporary-cessation clause

Generally, a *temporary-cessation clause* in an oil-and-gas lease "provides that a lease will remain in force during the secondary term in the absence of actual production if the lessee conducts drilling or reworking operations within a fixed number of days of the original cessation of production." *BP America Production Co v Red Deer Resources, LLC*, 526 SW3d 389, 394–95 (Tex 2017). It also typically designates a time during which cessation will not terminate the lease. 3 Williams & Meyers Oil and Gas Law §616.2.

The temporary-cessation clause here follows that general approach and provides:

> If production should cease from any production unit, this lease shall terminate . . . unless lessee commences drilling or reworking operations on such unit within one hundred twenty (120) consecutive days . . . ; and if production is restored from this unit, this lease shall remain in effect as to the lands and depths included therein as long as oil or gas is produced from such unit.

> Any cessation or absence of drilling or reworking operations or production on or from a production unit which continues for a period of one hundred twenty (120) consecutive days or more shall be deemed for all purposes of this lease to be permanent and not temporary.

ROA 5957–58.

There's no dispute that EP Energy resumed production within 120 days of cessation. Dkt 14 at 22; ROA 5690. Even so, the MSB Owners contend that EP Energy didn't maintain the leases because this clause requires EP Energy to actually undertake drilling or reworking operations within 120 days of ceasing production in order to maintain the lease. "Simply turn[ing] the wells back on" does not, in the MSB Owners' view, maintain the leases. Dkt 6 at 57.

The Bankruptcy Court held that, under the *habendum* clause, EP Energy could maintain the leases "so long . . . as oil or gas [was] produced" or if the lease was "maintained in force and effect under other terms and provisions." ROA 5691–92. It acknowledged that when production initially ceased, EP Energy was forced to rely on the temporary-cessation clause to maintain the leases. This, it noted, required "drilling or reworking operations" within 120 days, and EP Energy didn't perform any such drilling or reworking operations within that required timeline. But it further observed that EP Energy restored production well within the 120 days and found that this was sufficient to maintain the lease. "[O]nce production was restored, EP Energy could go back to relying on the habendum clause's continuous-production condition," that is, the leases were maintained "as long as oil or gas [was] produced." ROA 5691–92. The Bankruptcy Court noted that construing the leases otherwise would lead to the "odd (and perhaps unreasonable) result" that "EP Energy would be

forced to expend additional resources [drilling or reworking], all with capable wells sitting idle. While EP Energy was unnecessarily drilling or reworking, neither party would receive the economic benefits of the existing productive wells." ROA 5694–95.

The MSB Owners contend that the Bankruptcy Court misinterpreted the temporary-cessation clause by ignoring the language "this lease shall terminate." Dkt 6 at 59. They argue that such language should be construed as a special limitation, which actively cuts short the life of a lease unless the stated conditions occur, regardless of any other savings provision. See *Endeavor Energy*, 554 SW3d at 606: "A special limitation in an oil and gas lease provides that the lease will automatically terminate upon the happening of a stipulated event." In the MSB Owners' view, once EP Energy ceased production, this special limitation was in effect, and EP Energy could no longer rely on the continuing-production option in the *habendum* clause to save the lease.

The Bankruptcy Court didn't err in declining to interpret the temporary-cessation clause as a special limitation and in holding that EP Energy could continue to rely on the continuing-production option in the *habendum* clause. In the first place, the Texas Supreme Court observes that "we will not find a special limitation unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Endeavor Energy*, 615 SW3d at 148. At minimum, the lease here is not "so clear, precise, and unequivocal" that if production ceases, then the only way to maintain the lease is to conduct drilling or reworking operations, even if none are needed. Rather, an "other meaning" is readily apparent— resuming production also maintains the lease.

Second, while Texas courts have found that the phrase "this lease shall terminate" is indicative of a special limitation, such language isn't dispositive. See Dkt 15

24

at 22–23, citing *PPC Acquisition Co v Delaware Basin Reservation, LLC*, 619 SW3d 338, 350 (Tex App—El Paso 2021, no pet) and *Hitzelberger v Samedan Oil Corp*, 948 SW3d 497, 506 (Tex App—Waco 1997, writ denied). Indeed, the Texas Supreme Court has found that a clause containing that phrase can be ambiguous and declined to enforce it as a special imitation. See *Endeavor Energy*, 615 SW3d at 155.

The MSB Owners alternatively argue that the plain language and structure of the temporary-cessation clause is contrary to the interpretation of the Bankruptcy Court. They argue that this phrase—"if production should cease from any production unit, this lease shall terminate . . . unless [EP Energy] commences drilling or reworking operations"—conclusively sets out what EP Energy *must* do to prevent termination. They would thus segregate the remainder of that clause—"; and if production is restored from such unit, this lease shall remain in effect"—as an "additional and subsequent" requirement to maintain the lease. Dkt 6 at 60.

The Bankruptcy Court correctly harmonized both parts of the temporary-cessation clause. It read the "and if" provision to "identif[y] the event that will hold the lease in force—the restoration of production." ROA 5691. And it read the word "and" to mean that production may be restored by drilling and reworking "also, added to, or as well as" production. ROA 5693, citing Webster's Concise Dictionary of the English Language 26 (1998 ed). Texas courts also observe that, when two clauses are separated by a semicolon and the word "and," the application of "basic grammar rules" indicates that "each clause stands alone." *In re Great Plains Management Corp*, 665 SW3d 717, 725 (Tex App—San Antonio 2022, pet filed). The semicolon with the word "and" is thus best taken to mean "also," with the following clause providing an *additional* method of maintaining the lease.

The reading given by the Bankruptcy Court also harmonizes with the last sentence of the temporary-cessation clause, which provides:

> Any cessation or absence of drilling *or* reworking operations *or* production on or from a production unit which continues for a period of one hundred twenty (120) consecutive days or more shall be deemed for all purposes of this lease to be permanent and not temporary.

ROA 5957–58 (emphasis added). This clause clarifies that cessation must itself continue for more than 120 days and is only permanent if "reworking operations *or* production" don't begin again within 120 days. Or, looked at from the other direction, if "reworking operations *or* production" begin within 120 days, the cessation is only temporary, and the lease remains in effect. The leases can be maintained through either of these means. See *BP America Production Co v Red Deer Resources, LLC*, 526 SW3d 389, 396 (Tex 2017) (holding that "party claiming total cessation of production must prove that . . . there has been a total cessation of production for a period longer than that permitted in the lease's cessation-of-production savings clause"). This reading best harmonizes all parts of the temporary-cessation clause and the rest of the lease.

The Fifth Circuit has construed similar "and if production results" language in this manner. The lease in *Duke v Sun Oil Co* stated that the lease would continue for the primary term, and then:

> as long thereafter as oil, gas or other mineral is produced from said land, or as long thereafter as Lessee shall conduct drilling or reworking operations thereon with no cessation of more than sixty consecutive days until production results, *and if production results*, so long as any such mineral is produced.

320 F2d 853, 857 (5th Cir 1963) (emphasis added). A cessation of production occurred, and the Fifth Circuit construed the clause to mean that the lease would terminate unless the lessee "commences drilling, reworking operations, *or* . . . production results." Id at 861 (emphasis added). It explained, "This interpretation is consistent with the primary purpose of the lease, i.e., to achieve production." Id. Notably, the "and if" phrase of the temporary-cessation clause in *Duke* followed a comma instead of a semicolon. But if anything, that would only serve to amplify the same construction.

Likewise, in *Skelly Oil v Harris*, the Texas Supreme Court held that a clause providing that the lease "shall not terminate if the Lessee commences additional drilling or reworking" could be kept in force by production. 352 SW2d 950, 950 (Tex 1962). And in *Mayers v Sanchez-O'Brien Minerals Corp*, a Texas appellate court similarly held that a temporary-cessation clause providing that "if after discovery and production of oil, gas or other mineral, the production thereof should cease, this lease shall not terminate if Lessee commences operations for drilling or reworking" could be kept in force by production. 670 SW2d 704, 708–09 (Tex App—San Antonio 1984, writ refused). True, the *Skelly* and *Myers* clauses were both phrased as "this lease *shall not* terminate *if*" rather than the phrasing here that "this lease *shall* terminate *unless*," and they involved savings clauses other than a temporary-cessation clause. See Dkt 15 at 26. But they still support the general proposition that the "drilling or reworking" requirement in a savings clause doesn't preclude maintaining the lease by production.

As summarized in a respected treatise on the topic, to maintain a lease under a temporary-cessation clause, what matters is that "actual production from the well or else . . . reworking or drilling operations" begin within the time period. 1 Ernest Smith and Jacqueline Weaver, *Texas Law*

*of Oil and Gas* §4.5[B] (2d ed). The Bankruptcy Court thus didn't err when it interpreted "; and if production is restored from this unit, this lease shall remain in effect," to be an additional way in which the lease could be maintained.

The MSB Owners further argue that the Bankruptcy Court's reading of the temporary-cessation clause renders the shut-in and *force majeure* clauses of the leases meaningless. Dkt 31, citing *MIECO, LLC v Pioneer Natural Resources USA, Inc*, 2024 WL 3418718, *5 (5th Cir). Not so.

As an initial matter, the citation to *MIECO* is wholly inapposite. It involved breach of a natural-gas sales agreement rather than an oil-and-gas lease. *MIECO*, 2024 WL 3418718 at *1. As it relates to this case, *MIECO* simply stands for the general proposition that courts shouldn't interpret a contract in a way that renders any provision meaningless or superfluous. Id at *5. But the Bankruptcy Court's determination here didn't do so.

Beyond this, the provision as to shut-in royalty is easily harmonized with the temporary-cessation clause. It provides:

> If there shall be a well on the leased premises capable of producing gas, but from which gas is not sold or used off the leased premises . . . lessee may pay or tender to lessor, as shut-in royalty, a yearly sum equal to [$100] per acre times the number of acres of the leased premises included within the production unit for such well. The first such payment of shut-in royalty shall be made on or before ninety (90) days after the date on which (i) such well was shut-in, or (ii) this lease ceases to be otherwise maintained as to the unit on which such well is located under other

28

> provisions hereof, whichever is later . . .
> and if such shut-in royalty shall be paid or
> tendered as above provided, this lease
> shall, subject to the other terms and
> provisions hereof, remain in force and
> effect as to the production unit for which
> such payment is made, for a period of one
> (1) year from the date of such payment, and
> while such lease is thus continued in force,
> it shall be considered for all purposes under
> this lease that such well is producing gas
> from such unit . . . .

ROA 5962. The MSB Owners argue that, under the Bankruptcy Court's reading, EP Energy "would have no need to restrict shut-in wells to gas wells or to tender shut-in payments as required by the Shut-in clause." Dkt 31 at 2. But, even under the Bankruptcy Court's reading, the distinct shut-in and the temporary-cessation clauses have different purposes that work harmoniously to fulfill the purpose of the lease—production in paying quantities.

A temporary-cessation clause will automatically terminate a lease if production has ceased for longer than the period permitted in the lease. See *Red Deer*, 526 SW3d at 395–96. But the lease can still be sustained if another savings clause applies, including a shut-in royalty clause. Id at 396. Generally, a shut-in royalty clause allows the lessee to "bring about constructive or contractual production" and thus sustain the lease when there is not actual production. *EnerQuest Oil & Gas, LLC v Plains Exploration & Production Co*, 981 F Supp 2d 575, 586 (WD Tex 2013), citing *Gulf Oil Corp v Reid*, 337 SW2d 267 (1960).

Here, under the Bankruptcy Court's interpretation, EP Energy could sustain the lease under the temporary-cessation clause if it resumed production within 120 days of a cessation. The shut-in royalty clause would be one way

"production" could be restored, thus sustaining the lease. Under the Bankruptcy Court's interpretation, then, the shut-in royalty clause isn't a superfluous provision but is instead one that works in tandem with the temporary-cessation clause. See 3 Williams and Meyers Oil and Gas Law §616.4 (noting Texas cases holding that lease may be preserved by payment of shut-in royalty within period of time authorized by cessation-of-production clause for resumption of operations).

In actuality, it is the MSB Owners' interpretation of the lease that would not, in fact, harmonize the shut-in royalty and temporary-cessation clauses and would lead to unreasonable results. If the temporary-cessation clause served to maintain the lease only by drilling or reworking (and not resuming production), no provision would exist in the lease to allow for short-term cessation of production. This would mean that, for a cessation of even one second, EP Energy would either have to pay shut-in royalties or conduct expensive drilling and reworking operations. That result isn't reasonable or consistent with the text of the temporary-cessation clause, which (as previously determined) specifically provides that the lease can be sustained by restoring production within 120 days. And indeed, in an oil-and-gas lease, "the doctrine of temporary cessation of production is a practical necessity, because oil and gas are never produced and marketed in a continuous, uninterrupted operation that goes on every hour of the day and night." 2 Eugene O. Kuntz, *A Treatise on the Law of Oil & Gas* at 417. Both a shut-in royalty clause *and* a temporary-cessation clause as interpreted by the Bankruptcy Court are crucial parts of operation of the lease.

The *force majeure* clause is likewise readily harmonized with the Bankruptcy Court's reading of the temporary-cessation clause. It provides:

> If, while this lease is in force, lessee's operations are delayed or interrupted by reason of [*force majeure* acts or events], and which acts or events delay or cause the cessation of operations and are not the result, in whole or in part, of errors or omissions on the part of Lessee which result in such delay, then this lease shall be extended until such delaying cause or causes has terminated. Provided, however, such delay shall in no event extend or provide an excuse hereunder for a period longer than one hundred (120) [sic] days. Lessee shall promptly, and within fifteen (15) days of the commencement of such circumstances or cause of delay as provided herein, notify lessor of the occurrence of any act of force majeure, the nature of the act and also promptly notify lessor of its termination.

ROA 5978–79.

The MSB Owners argue that, under the Bankruptcy Court's reading of the temporary-cessation clause, EP Energy would not "need to claim a force majeure event or send notice as required by the Force Majeure cause" because it could simply voluntarily cease production and resume it again within 120 days under the temporary-cessation clause. Dkt 31 at 2. But the *force majeure* clause covers an entirely different circumstance than the temporary-cessation clause—that being, a cessation of operations that is *not* attributable to action or conduct by EP Energy. Given that EP Energy doesn't dispute that it voluntarily ceased production, the *force majeure* clause simply isn't applicable. And it cannot be said that the Bankruptcy Court's interpretation leaves the *force majeure* clause entirely without purpose or effect. For example, if a

31

*force majeure* occurred while EP Energy had ceased production, the obligation to commence operations or restore production would, with proper notice given by EP Energy, be tolled for up to 120 days under the *force majeure* clause. See Dkt 34 at 2–3. Again, as with the shut-in royalty clause, the *force majeure* clause works in tandem with the temporary-cessation clause.

The MSB Owners also take issue with the Bankruptcy Court's use of hypotheticals and determination that the MSB Owners' position, if accepted, would "result in unreasonable real-world consequences." Dkt 6 at 48, 50–52 citing ROA 5677. It isn't clear why this should be seen as problematic. Quite to the contrary, it's typical of construction of contracts in many contexts. It's also in accord with dictates from the Texas Supreme Court, which has admonished that courts should "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Endeavor Energy*, 615 SW3d at 153.

As such, real-world consequences are appropriately considered when interpreting an oil-and-gas lease. And this pairs with further observation by the Texas Supreme Court that the purpose of an oil-and-gas lease "is to have the oil and gas on the leased premises produced and marketed so that [the lessor] may receive his royalty therefrom, and . . . to discover and produce oil and gas in such quantities as will yield [the lessee] profit." *Garcia v King*, 164 SW2d 509, 511 (Tex 1942). These purposes are "material elements to be considered in the interpretation of the contract." Ibid.

As already noted, allowing temporary cessation of production is a practical necessity, given that interruption in oil-and-gas operations occur frequently. Kuntz, *A Treatise on the Law of Oil & Gas* at 417. Such interruptions have long been recognized as a prevalent phenomenon in scholarly work in this area:

> The production required to keep an oil and
> gas lease in effect during the secondary

> term obviously cannot be continuous, since
> mechanical repairs, reworking operations,
> and breakdowns in pumping equipment
> can all result in the temporary cessation of
> production. Since these occurrences are
> incidental to the normal operation of the
> lease, the parties must have contemplated
> that the temporary cessation of production
> would not result in the automatic
> termination of the lease. Consequently all
> courts adhere to the principle that a
> temporary cessation of production will not
> terminate the lease.

Daniel L. Berman, *Dry Hole, Drilling Operations, and 30 Day–60 Day Drilling Operation Clauses*, 38 TEXAS LAW REVIEW 270, 281 (1960).

Given that incidental disruptions in production are known to occur at times over the life of an oil-and-gas lease, it's quite unreasonable for the MSB Owners to suggest that the parties expected EP Energy to conduct expensive drilling and reworking operations in all instances. From the "utilitarian standpoint" required by *Endeavor Energy*, the MSB Owners' interpretation thus doesn't serve the business activity at hand, being the production of oil and gas in paying quantities. Such interpretation would instead create inefficiency and engender unnecessary costs.

The MSB Owners also argue that the Bankruptcy Court's interpretation of the leases as allowing a temporary cessation of production allowed EP Energy to cease production merely upon finding of "good faith." As a result, they argue the Bankruptcy Court violated their due-process rights by determining without evidence that EP Energy ceased production in good faith. Dkt 6 at 52. No cases are cited to support this argument. Regardless, the Bankruptcy Court didn't rely on a finding of "good faith" by EP Energy in its determination that the leases weren't terminated. It simply stated that the leases were

maintained by EP Energy's undisputed compliance with material terms of the lease, following its interpretation of those terms. No violation of due process occurred in this respect.

The Bankruptcy Court thus didn't err in its determination, in line with an appropriate synthesis of all of the text, that the parties rationally contemplated that the lease could be maintained through short-term cessations of production simply by resuming production. And this in turn means that it didn't err in ruling that the MSB Owners' claim was futile as to the leases that were held by production under the temporary-cessation clause.

4. Conclusion

The Bankruptcy Court had jurisdiction to consider the merits of the administrative-expense claim. And it correctly interpreted the leases in its determination that no trespass occurred. Under the plain language, EP Energy maintained seven leases by complying with drilling obligations in the continuous development clause and maintained nine leases by restoring production within 120 days under the temporary-cessation clause. The MSB Owners' administrative-expense claim on this basis is futile.

The memorandum opinion and related order of the Bankruptcy Court are AFFIRMED. ROA 5651–97, 5698.

SO ORDERED.

Signed on September 30, 2024, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge